United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DONNA L. FERRIS,

      Plaintiff,

   v.

JO ANNE B. BARNHART, Commissioner,
Social Security Administration,

      Defendant.

_____

No. C 04-5465 CW

ORDER DENYING
PLAINTIFF'S
MOTION FOR
SUMMARY JUDGMENT;
DENYING
DEFENDANT'S
CROSS-MOTION FOR
SUMMARY JUDGMENT;
REMANDING FOR
FURTHER
PROCEEDINGS

    Plaintiff Donna Ferris has filed a motion for summary
judgment.  Defendant Jo Anne Barnhart, in her capacity as
Commissioner of the Social Security Administration (Commissioner)
opposes this motion and cross moves for summary judgment.  Having
considered all of the papers filed by the parties, the Court DENIES
Ferris' motion, DENIES Defendant's cross-motion and REMANDS for
further proceedings.

BACKGROUND

I. Ferris' Education and Work Experience

    Ferris was born on August 6, 1946.  Administrative Record (AR)
at 17.  Her education and work experience are undisputed.  She
graduated from high school in 1964 and attended Eaton College for

two years starting in 1974.  AR at 73.  From 1976 until November, 2000, she worked as a psychiatric technician at the Sonoma Developmental Center.  AR at 68.  Her duties included total patient care, medication of patients and supervision of other technicians.  AR at 68.  In 1999 she sustained the shoulder injury discussed below and, in 2001, she attended Empire College for five months to retrain for a new job.  AR at 17.  From October, 2001 until June, 2002, she worked three days a week as a medical assistant, mostly pulling and filing charts and updating paperwork in the charts.  AR at 68.  She then quit due to pain in her shoulders.  AR at 67.

II. Plaintiff's Medical History

Ferris' use of her right thumb is limited.  In January, 1995, Ferris injured her right thumb at work in the course of assisting a patient.  AR at 113.  Ferris was treated with physical therapy and then with an injection.  AR at 125.  She returned to work full-time, except that she did not restrain patients.  AR at 117.  Her symptoms persisted, and on December 28, 1995, the Surgery Center in Santa Rosa carried out right thumb carpometacarpal joint ligament reconstruction and tendon interposition arthroplasty.  AR at 121.

In his capacity as a Qualified Medical Examiner for the Worker's Compensation Disability Evaluation Unit, Dr. Robert Geiger examined Ferris on September 23, 1997.  AR at 119.  He noted a scar on her thumb and stated that Ferris was precluded from repetitive forceful grasping and pinching with her right thumb.  AR at 126. At that time, he noted no problems with Ferris' shoulders.

Two years later, at work on September 23, 1999, Ferris sustained the injury to her left shoulder.  AR at 198.  She was

referred to Dr. Kenneth Geiger.  AR at 198.  A December 9, 1999,
MRI scan demonstrated a loose body adjacent to the posterior,
inferior aspect of the humeral head.  AR at 189.  A second opinion
by a Santa Rosa physician, Dr. Sellman, indicated that she had
glenohumeral arthritis of the left shoulder and a supraspinatus
tear of the cuff.  AR at 189.  Dr. Kenneth Geiger recommended
surgery; Dr. Sellman did not strongly recommend surgery, although
he stated that it was an option.  AR at 198.  Ferris chose not to
have the surgery because she feared surgery.  AR at 198.  This
decision also was based on another doctor's later recommendation
that she put it off as long as possible because of her age and the
limited duration of the effects of the surgery.  AR at 213.  On
October 5, 2000, Dr. Robert Geiger, an orthopaedic surgeon who saw
Ferris in connection with her worker's compensation claim, advised
that Ferris should not continue in her psychiatric technician
position because the job included lifting and positioning patients.
AR at 190.

     After transitioning in 2001 to the medical assistant position,
Ferris continued to complain of shoulder pain, but now in both
shoulders.  AR at 145.  Her last day of work as a medical assistant
was June 27, 2002, when she resigned.  AR at 67.  Ferris applied
for Social Security Disability benefits on July 1, 2002.  AR at 58.
Dr. Parker of Advanced Open View MRI did another MRI on July 2,
2002, this time on her right shoulder, which revealed advanced
degenerative changes of the glenohumeral joint, a large joint
effusion with loose bodies and a partial thickness tear of the
rotator cuff.  AR at 129.

United States District Court
For the Northern District of California

On November 3, 2002, Dr. Qian conducted an orthopedic evaluation for the Social Security Administration.  AR at 130.  Dr. Qian's signed statement lists his qualification as "Physical Medicine and Rehabilitation Board Eligible."  AR at 132.  Ferris told Dr. Qian that she was told not to have shoulder surgery because of severe osteoarthritis in both shoulders.  AR at 130. Ferris' weight was measured at 312 pounds, and Dr. Qian noted that her past medical history was "significant for diabetes, hypertension, and obesity."  AR at 131.  He diagnosed shoulder pain due to degenerative joint disease, shoulder impingement and rotator cuff tears.  AR at 132.  After his examination, Dr. Qian did not restrict the duration of Ferris' sitting or standing and allowed her to lift and carry ten pounds frequently and twenty occasionally.  AR at 132.  He did not limit her posturally, but stated that she should avoid frequent overhead reaching.  AR at 132.  Dr. Qian also noted the extent of movement possible in her shoulders, wrists, fingers and thumbs.  AR at 132.  However, on a Social Security Administration form, Ferris stated that Dr. Qian examined her for only ten minutes.  AR at 111.  According to Ferris, "I did not feel he asked me about the pain in my shoulders or of any limitations I have.  He did not look at my hands."  AR at 111.

On November 20, 2002, Dr. Clancey, a non-examining medical consultant for the Social Security Administration, noted based on Ferris' medical records that Ferris is 5'6" tall (Ferris indicated she is 5'5" tall, AR at 66) and documented her increasing weight from 1997 to 2002.  AR at 139.  She limited Ferris to lifting or

4

United States District Court

For the Northern District of California

1  carrying less than twenty pounds occasionally and lifting or

2  carrying less than ten pounds frequently.  AR at 133.  She stated

3  that occasional pushing and pulling in the upper extremities was

4  allowed.  AR at 133.  She limited climbing, crawling, handling and

5  reaching overhead to the occasional level.  AR at 134-35.

6      On November 27, 2002, Dr. Miles, an orthopedic surgeon and one

7  of Ferris's treating physicians since at least May, 1999, noted in

8  his medical records that she complained of crepitus[1] in both

9  shoulders.  AR at 18, 141.  He took x-rays of both shoulders and

10 examined the MRI of her right shoulder.  AR at 141.  He diagnosed

11 near end-state osteoarthritis in the right shoulder and marked to

12 severe osteoarthritis in the left shoulder.  AR at 141.  He noted

13 that Ferris was "overweight."  AR at 141.  Dr. Miles marked on a

14 Medical Source Statement that Ferris had been unable, since May,

15 1999, to walk or stand more than six out of eight hours on the job,

16 to lift any weight on a continuing basis, to carry more than five

17 pounds for more than one hour a day.  AR at 182-83.  He also noted

18 that Ferris could not reach, handle, or finger more than thirty

19 minutes a day, could not stoop or kneel more than six hours a day

20 and could not crouch more than four hours a day on the job.  AR at

21 183-85.  Dr. Miles opined that Ferris could not perform sedentary

22 work.  AR at 180.

23     Dr. Grace has been Ferris' primary care physician since 1972.

24 AR at 69.  In 2001 and 2002, Dr. Grace was primarily treating

25 _____

26     [1]Noise or vibration produced by rubbing bone or irregular
    degenerated cartilage surfaces together as in arthritis and other
    conditions.  Stedman's Online Medical Dictionary. (Lippincott,
27  Williams & Wilkins, 2005).

28                                    5

United States District Court

For the Northern District of California

Ferris for obesity, hypertension and diabetes.  AR at 144-54.
However, he ordered the July, 2002 MRI that Dr. Parker performed.
AR at 129.  In March, 2002, Dr. Grace noted that Ferris was having
trouble sleeping because of shoulder pain.  AR at 146.  According to
Dr. Grace's July 19, 2002 medical notes, he believed that Ferris
could not function effectively without surgery on her shoulders.
AR at 145.  His December, 2002 record documented Ferris' ongoing
complaints of shoulder pain and her consultation with Dr. Miles.
AR at 144.  In his December, 2002 record, Dr. Grace also
recommended gastric surgery for morbid obesity prior to any
shoulder surgery to reduce the risks associated with anesthesia.
AR at 144.  In the same note, Dr. Grace opined that Ferris was
unable to work, and stated that he advised her to seek Social
Security benefits for disability.  AR at 144.  However, Dr. Grace's
May, 2003 record of a follow up visit to review Ferris'
hypertension and diabetes found "no significant joint or back
problems."  AR at 168.  The same note also stated that "the patient
continues to be markedly obese" and that her "hypertension and
diabetes [are] under marginal control."  AR at 168.  On June 16,
2003, Dr. Grace marked on a Medical Source Statement for the Social
Security Administration that Ferris had been unable, since January,
2000, to sit more than one hour out of eight in a regular work day,
to walk or stand at all on the job, to lift or carry any weight on
a continuing basis, and could not reach, handle, finger, feel,
stoop, kneel or crouch at all on the job.  AR at 174-77.  Finally,
Dr. Grace opined that Ferris could not perform sedentary work.  AR
at 172.

On March 6, 2003, Dr. Cistone, another non-examining medical consultant for the Social Security Administration, limited Ferris' ability to push and/or pull in the upper extremities.  AR at 156. She limited Ferris to lifting and/or carrying five to six pounds occasionally and lifting and/or carrying five pounds frequently. AR at 156.  She also limited Ferris to occasional climbing, crawling and overhead reaching.  AR at 157.  Dr. Cistone limited Ferris to occasional shoulder rotation, but did not limit other reaching involving only her elbows.  AR at 158.

III. Procedural History

Ferris filed an application for disability insurance benefits under Title II and Title XVIII [sic] of the Social Security Act, on July 1, 2002.  AR at 58.  Ferris' statements with regard to the onset of her alleged disabilities are inconsistent.  On her original disability report, Ferris stated that she became unable to work on May 30, 1999.  AR at 67.  However, she also stated that she actually stopped working on June 27, 2002.  AR at 67.  Her application for disability likewise states that she became unable to work on June 27, 2002.  AR at 58.

In her application, Ferris alleges that shoulder injuries and difficulties in using her right thumb made her unable to work.  AR at 67.  As part of the disability benefits application process, in May, 2003, Ferris completed a Daily Activities Questionnaire.  In it, she detailed the extent of her ability to function in daily life.  She stated that she is only able to do household activities "very slowly," spreading them "out over the week."  AR at 98-99. She also stated that some days she does "nothing" and that she

7

cannot sleep more than "1-2 hours at a time."  AR at 98.

On November 26, 2002, Ferris' claim was denied, whereupon she filed for reconsideration.  AR at 24.  On March 13, 2003, the motion for reconsideration was denied.  AR at 29.  On July 14, 2003, a hearing was held before an ALJ.  Ferris appeared and was represented by claimant representative Dr. Dan McCaskell.[2]  AR at 210.  Ferris testified at the hearing that one of the problems she had in her job as a medical assistant was pulling charts "because some were overhead and some were low and it was just real strenuous on my shoulders."  AR at 220.

At the hearing, the ALJ considered the testimony of Robert Raschke, a vocational expert.  The ALJ gave Raschke a residual functional capacity[3] (RFC) hypothetical:

> combined ability to stand and walk six hours out of an
> eight hour day, sitting is six out of eight.  Lifting
> and carrying is 10 pounds maximum at any time.
> Postural maneuvers crouch, crawl, kneel, climb, stoop
> and balance are at the occasional level.  Bilaterally
> with the upper extremities.  Occasional reaching,
> including occasional overhead.  But no overhead pushing
> or pulling.  And with the upper extremity, no forceful
> grasping or handling or other activity with the right
> thumb . . . no forceful grasp, handle or key with
> right.

AR at 226-27.  Raschke then testified that Ferris could not perform her previous work as a medical assistant.  AR at 229-30.  The hypothetical RFC was between the light and sedentary

---

[2]The transcript of the hearing incorrectly lists Dr. McCaskell as an attorney.  Dr. McCaskell does not claim to be an attorney. AR at 104.

[3]Residual functional capacity is the most a person can do in spite of limitations from impairments and related symptoms.  20 C.F.R. §404.1545(a).

classifications.  AR at 231.  Due to Ferris' age of 57, the

distinction between light and sedentary is significant because at

the sedentary level there can be little vocational adjustment after

age 55, but at the light level the age for little vocational

adjustment is 60.  AR at 232-33.  Raschke further testified that

there were no other medical jobs that fit that RFC.  AR at 234.  He

did state, however, that the work duties of an information clerk or

park aide would meet the RFC.  AR at 234.

   The ALJ conducted a follow-up hearing by phone one week later.

At that time, the ALJ revised the hypothetical RFC to include

frequent, non-forceful gripping or grasping using the right thumb.

AR at 249.  The ALJ, McCaskell and Raschke then discussed how that

change broadened the possible jobs that would fit the RFC.  In the

context of discussing general clerical occupations, Raschke

testified, "[I]s the person retrieving things from different parts

of their desks throughout the course of the day, yes.  Is it always

at a frequent level, no, but even if it is we're talking about

essentially an area that is generally what, 3X5."  AR at 260.

Raschke also testified that Ferris was able to perform the duties

of a Medical Records Clerk.  AR at 255.  The Dictionary of

Occupational Titles (DOT) describes the work of a medical records

clerk (245.362-010) as follows:

> Compiles, verifies, types, and files medical records of
> hospital or other health care facility: Prepares
> folders and maintains records of newly admitted
> patients. Reviews medical records for completeness,
> assembles records into standard order, and files
> records in designated areas according to applicable
> alphabetic and numeric filing system. Locates, signs
> out, and delivers medical records requested by hospital
> departments. Compiles statistical data, such as

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

> admissions, discharges, deaths, births, and types of
> treatment given. Operates computer to enter and
> retrieve data and type correspondence and reports. May
> assist other workers with coding of records. May post
> results of laboratory tests to records and be
> designated Charting Clerk (medical ser.).

Raschke testified that the DOT described the job as requiring

frequent reaching, but that he disagreed.  AR at 262.  Raschke

testified that the DOT was based on job studies done years earlier,

before the move towards electronic information.  AR at 268.  He

also testified that most of a medical records clerk's work was done

sitting down.  AR at 266.  Raschke testified:

> we all know these people, they're sitting in our
> doctor's and dentist's office and for the most part
> they're sitting there with headphones on and generally
> speaking the heaviest thing that they're handling is a
> pen or a keyboard or they're looking up for when
> they're going to give you your next appointment, you
> know, there may be some occasional file pulling but,
> you know, considering the work load it's a relatively
> small part of the day.

AR at 266.

IV.  The ALJ's Findings

On January 26, 2004, the ALJ issued an opinion finding that

Plaintiff was not disabled within the meaning of the Social

Security Act and was able return to work, although not to her past

relevant work.  AR at 21.  The ALJ found that Ferris met steps one,

two and four of the five required to prove a disability under 20

C.F.R. section 404.1520.  AR at 17.  The ALJ found Ferris'

"subjective complaints to be generally but not fully credible," and

said, "Her testimony may be accurate in terms of impairment and

impact on her ability to do past relevant work but is not supported

by and is inconsistent with the record as to her ability to do

10

**United States District Court**
For the Northern District of California

1  other work."  AR at 19.  The ALJ cited daily activities Ferris

2  stated she was able to do on her Daily Activities Questionnaire,

3  including leaving her home, driving, visiting family and friends,

4  cooking, reading, occasionally sewing, picking up mail and

5  shopping.  AR at 19.  He noted that Ferris took strong medication

6  that allowed her to control pain and "engage in fairly extensive

7  activities of daily living."  AR at 19.

8      The ALJ accepted Raschke's testimony that the job of a medical

9  records clerk required frequent gripping and grasping and light

10  movement of the arms, all at desk-top level, rather than frequent

11  extension of the arms and movement of the shoulders.  AR at 20.

12      The ALJ accorded Dr. Grace's opinion, as given in his Medical

13  Source Statement on Ferris's restrictions, "little weight" because

14  he did not "explain his opinion" or give "laboratory or physical

15  findings to support the stated conclusion."  AR at 20.  He also

16  referred to Dr. Grace's May, 2003 record noting "no significant

17  joint or back problems."  AR at 168.  The ALJ did not mention Dr.

18  Grace's December, 2002; July, 2002; or March, 2002 records

19  documenting Ferris' shoulder problems.  The ALJ gave Dr. Miles'

20  opinion in his Medical Source Statement "little weight" because Dr.

21  Miles put down May, 1999 as the date of onset of the restrictions.

22  AR at 20.  He stated that the RFC was "mostly consistent" with

23  Dr. Cistone's opinion, which was in turn "mostly consistent" with

24  Dr. Robert Geiger's findings on Ferris' right thumb and complaints

25  of left shoulder pain in 2000 and Dr. Qian's conclusion that Ferris

26  could not do frequent overhead work.  AR at 19.

27      The ALJ found that Ferris' severe impairments were "bilateral

28                                11

United States District Court

For the Northern District of California

1   osteoarthritis of the shoulders, partial thickness tear of the left

2   rotator cuff, right thumb arthroplasty, and obesity."  AR at 17.

3   He found that Ferris did not meet step three because Ferris'

4   combination of impairments did not meet listing level severity.  AR

5   at 17.  The ALJ found Ferris had the following RFC:

> I find that claimant has the residual functional
> capacity (RFC) to perform work that does not require:
> standing or walking more than 6 hours in an 8-hour
> workday, sitting more than 6 hours in an 8-hour
> workday, lifting or carrying more than 10 pounds
> maximum, climbing, stooping, balancing, kneeling,
> crouching, or crawling more than occasionally, pushing
> or pulling overhead bilaterally, reaching bilaterally
> more than occasionally, including overhead bilaterally,
> and repetitive (frequent) forceful gripping or grasping
> with the right thumb, including pinching and keying.

12  AR at 19.  He also found that she could work as a medical records

13  clerk and thus did not meet step five.  AR at 20.

14      Ferris timely appealed to the Appeals Council.  On October

15  29, 2004, the Appeals Council denied her request for review.  AR at

16  5.

17                       LEGAL STANDARD

18  I.   Overturning a Denial of Benefits

19      A court cannot set aside a denial of benefits unless the ALJ's

20  findings are based upon legal error or are not supported by

21  substantial evidence in the record as a whole.  42 U.S.C. § 405(g);

22  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989); Martinez v.

23  Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  Substantial evidence

24  is such relevant evidence as a reasonable mind might accept as

25  adequate to support a conclusion.  Richardson v. Perales, 402 U.S.

26  389, 401 (1971); Orteza v. Shalala, 50 F.3d 748, 749 (9th Cir.

27  1995).  It is more than a scintilla but less than a preponderance.

28                              12

Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

To determine whether substantial evidence exists to support the ALJ's decision, a court reviews the record as a whole, not just the evidence supporting the decision of the ALJ.  Walker v. Matthews, 546 F.2d 814, 818 (9th Cir. 1976).  A court may not affirm the ALJ's decision simply by isolating a specific quantum of supporting evidence.  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  In short, a court must weigh the evidence that supports the Commissioner's conclusions and that which does not.  Martinez, 807 F.2d at 772.

If there is substantial evidence to support the decision of the ALJ, it is well-settled that the decision must be upheld even when there is evidence on the other side, Hall v. Secretary, 602 F.2d 1372, 1374 (9th Cir. 1979), or when the evidence is susceptible to more than one rational interpretation, Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984).  If supported by substantial evidence, the findings of the ALJ as to any fact will be conclusive.  42 U.S.C. § 405(g); Vidal v. Harris, 637 F.2d 710, 712 (9th Cir. 1981).

II.  Establishing Disability Under the Social Security Act

Under the Social Security Act, "disability" is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).  The impairment must be so severe that the claimant "is not only unable to do his previous

13

work but cannot . . . engage in any other kind of substantial

gainful work."  42 U.S.C. § 423(d)(2)(A).  In addition, the

impairment must result "from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory techniques."  42 U.S.C.

§ 423(d)(3).

     To determine whether a claimant is disabled within the meaning

of the Social Security Act, the Social Security Regulations set out

a five-step sequential process.  20 C.F.R. § 404.1520 (b)-(f);

Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991); Reddick v.

Chater, 157 F.3d 715, 721 (9th Cir. 1998).  The burden of proof is

on the claimant in steps one through four.  Sanchez v. Secretary of

Health and Human Servs., 812 F.2d 509, 511 (9th Cir. 1987).  In

step one, the claimant must show that she or he is not currently

engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).

In step two, the claimant must show that he or she has a "medically

severe impairment or combination of impairments" that significantly

limits his or her ability to work.  20 C.F.R. § 404.1520(c); Bowen

v. Yuckert, 482 U.S. 137, 140 (1987); Smolen v. Chater, 80 F.3d

1273, 1290 (9th Cir. 1996).  If the claimant does not, he or she is

not disabled.  Otherwise, the process continues to step three for a

determination of whether the impairment meets or equals a "listed"

impairment which the regulations acknowledge to be so severe as to

preclude substantial gainful activity.  Yuckert, 482 U.S. at 141;

20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1.  If

this requirement is met, the claimant is conclusively presumed

disabled; if not, the evaluation proceeds to step four.  At step

United States District Court

For the Northern District of California

14

four, it must be determined whether the claimant can still perform "past relevant work." <u>Yuckert</u>, 482 U.S. at 141; 20 C.F.R. § 404.1520(e).  If the claimant can perform such work, he or she is not disabled.  If the claimant meets the burden of establishing an inability to perform prior work, the burden of proof shifts to the Commissioner for step five.  At step five, the Commissioner must show that the claimant can perform other substantial gainful work that exists in the national economy.  <u>Yuckert</u>, 482 U.S. at 141; 20 C.F.R. § 1520(f).

DISCUSSION

I.   The ALJ's Failure to Consider Ferris's Obesity

Ferris argues that the ALJ failed to consider her obesity when determining her RFC.  The Commissioner contends that Ferris did not present evidence, medical or testimonial, of functional limitations caused by obesity.

An ALJ "must consider any additional and cumulative effects of obesity" when determining an obese individual's residual functional capacity.  20 C.F.R. § 404, subpart P, Appendix 1, ¶ 1.00 Q. Social Security Administration Ruling 02-01p states that an ALJ will explain how he reached conclusions as to whether obesity caused any physical or mental limitations to the individual whose disability status is being determined.  In <u>Celaya v. Halter</u>, 332 F.3d 1177, 1182-83 (9th Cir. 2003), the court remanded a disability case because the ALJ had not considered the effect of the illiterate, unrepresented plaintiff's obesity on her other impairments, general health and ability to work although she may not have even known she could claim obesity as an impairment.  The

15

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   court found that an ALJ has a "special duty to fully and fairly
2   develop the record and to assure that the claimant's interests are
3   considered . . . even when the claimant is represented by counsel,"
4   but "especially where the claimant is not represented." Id.
5   (citation omitted).  The court also noted that the ALJ should have
6   known simply by looking at the plaintiff that her obesity would
7   aggravate her other impairments. See id. at 1183 n.3. Celaya was
8   distinguished by Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir.
9   2005), because the record in Burch did not show that the
10  plaintiff's obesity exacerbated her other impairments, she was
11  represented by counsel, the ALJ did not find her obesity "severe"
12  and she did not present any further evidence of functional
13  limitations on appeal.

14      The record amply documents Ferris' obesity, which was noted by
15  Drs. Qian, Clancey, Miles and Grace.  While only Dr. Grace
16  explicitly linked her obesity to her other impairments, he was the
17  doctor most likely to be aware of that impact.  Dr. Grace primarily
18  treated Ferris for hypertension and diabetes, diseases often found
19  in conjunction with obesity.  Also, as Ferris' primary care
20  physician, he was most likely to be aware of the impact of Ferris's
21  obesity on her overall health.  Dr. Grace's December 20, 2002
22  record shows that he advised against surgery for her shoulders due
23  to the risks of anesthesia and recommended that Ferris should have
24  gastric surgery for her obesity first.  His limitations on Ferris'
25  activities are the most restrictive.  In fact, the ALJ did find
26  Ferris's obesity to be a severe impairment, but he did not address
27  this impairment in his RFC.

28                                  16

United States District Court

For the Northern District of California

1    Ferris argues that her obesity prevents her from performing

2    the job of a medical records clerk, contrary to the ALJ's finding,

3    because her obesity, coupled with her shoulder injuries, prevents

4    her from routinely reaching high while standing on a stool or

5    crouching low.  The DOT's description of a medical records clerk's

6    job duties requires "filing records in designated areas."  Ferris

7    provides evidence that most medical records rooms have files that

8    reach six or seven feet in height.  Pl.'s Ex., Attached to Motion

9    for Summary Judgment (showing two Internet vendors' advertised

10   filing shelves that are as high as 75-7/8 inches and 83 inches).

11   While Ferris did have a representative at the hearing and did

12   have a medical background that might enable her to address the

13   impact of her obesity on her other impairments, she was not

14   represented by an attorney.  Her representative did not ask her any

15   questions as to whether her obesity impacted her other impairments.

16   Furthermore, as in <u>Celaya</u>, the ALJ should have known simply by

17   looking at Ferris, given her height-weight ratio, that her obesity

18   would aggravate her other impairments.  The ALJ had a duty to

19   develop the record fully including determining the impact her

20   obesity had on her ability to perform the job he said she could do.

21   Therefore, the ALJ erred in not integrating Ferris's obesity

22   impairment into her RFC.

23   II.   The Opinions of Dr. Grace, Dr. Miles and Dr. Qian

24   Ferris argues that the ALJ improperly rejected treating

25   physicians Dr. Grace and Dr. Miles' opinions and improperly

26   accorded weight to Dr. Qian's opinion.  The Commissioner contends

27   that the ALJ properly weighed all the medical evidence and

28                                17

1    determined that Drs. Grace and Miles' reports were not supported by

2    objective evidence.

3         According to Social Security Regulations, the ALJ must give

4    more weight to the opinions of treating physicians than to either

5    examining or non-examining physicians, because treating physicians

6    usually provide "a detailed, longitudinal picture" of a claimant's

7    medical impairments.  20 C.F.R. § 404.1527(d)(2); see Rodriguez v.

8    Bowen, 876 F.2d 759, 761 (9th Cir. 1989).  In order to reject the

9    uncontradicted opinion of a treating physician, the ALJ must set

10   forth clear and convincing reasons for doing so.  Baxter v.

11   Sullivan, 923 F.2d. 1391 (9th Cir. 1991)(citing Davis v. Heckler,

12   868 F.2d 323, 326 (9th Cir. 1989)).  Where there are contradictions

13   between the opinion of the treating physician and others, the ALJ

14   must detail specific and legitimate reasons supported by

15   substantial evidence to reject the opinion of the treating

16   physician.  Lester v. Chater, 81 F.2d 821, 830 (9th Cir. 1995).  If

17   the treating physician's opinion is "brief, conclusory, and

18   inadequately supported by objective signs and laboratory findings,"

19   it is appropriate to reject it.  Thomas v. Barnhart, 278 F.3d 947,

20   957 (9th Cir. 2002); Magallanes v. Bowen, 881 F.2d 747, 750, 754

21   (9th Cir. 1989).  "Where the opinion of the claimant's treating

22   physician is contradicted, and the opinion of a nontreating source

23   is based on independent clinical findings that differ from those of

24   the treating physician, the opinion of the nontreating source may

25   itself be substantial evidence; it is then solely the province of

26   the ALJ to resolve the conflict."  Andrews v. Shalala, 53 F.3d

27   1035, 1041 (9th Cir. 1995).

28

United States District Court
For the Northern District of California

18

United States District Court

For the Northern District of California

1    When rejecting the opinion of an examining physician in favor
2    of a non-examining, non-treating physician, the ALJ must give
3    specific, legitimate reasons for doing so that are supported by
4    substantial record evidence.  Lester, 81 F.3d at 831 (citing
5    Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995)).  Even when
6    combined with evidence of the plaintiff's demeanor at the hearing,
7    the opinions of non-examining physicians do not meet the standard
8    of substantial evidence needed to reject the opinion of an
9    examining physician.  Id. (citing Gallant, 753 F.2d at 1456).

10    A. Dr. Grace

11    The ALJ did not find Dr. Grace's opinion on Ferris'
12    restrictions persuasive.  He noted that Dr. Grace's May, 2003
13    records found "no significant joint or back problems."  It is not
14    clear whether the joints referred to in those records included
15    Ferris' shoulder joints, but the ALJ could reasonably have assumed
16    that her shoulders were included in that statement.  That notation
17    by itself is not sufficient to discount Dr. Grace's recommendations
18    as a whole, however, because Dr. Grace made several references to
19    Ferris' shoulder problems in prior visits, and the main purpose of
20    the May, 2003 visit was to follow up on her diabetes and
21    hypertension.  Dr. Grace credited Ferris' shoulder problems because
22    he ordered an MRI in July, 2002, knew of her consultation with Dr.
23    Miles and documented her complaints of shoulder pain.  In light of
24    the record as a whole and Dr. Grace's other medical records, his
25    May, 2003 finding that Ferris had "no significant joint or back
26    problems" is not reliable.

27    The ALJ also discounted Dr. Grace's opinion because of his
28                                    19

failure to explain the severity of his restrictions.  Ferris argues
that it was the combination of her impairments, including her
obesity, that led to Dr. Grace's severe restrictions on her
mobility.  She points out that Dr. Grace noted in May, 2003 that
"the patient continues to be markedly obese" and that her
"hypertension and diabetes [are] under marginal control."
Nevertheless Dr. Grace gave no explanation of the very severe
limitations he placed on Ferris' activities in his Medical Source
Statement.  There is no evidence in the record that he performed
range of motion tests or other tests on her shoulders or other
parts of her body.  Given this lack of support and considering that
Dr. Miles, Ferris' other treating physician, did not limit Ferris'
mobility as severely, the ALJ did not err in giving little weight
to Dr. Grace's opinion.

     B. Dr. Miles

     Dr. Miles based his assessment of Ferris' range of permissible
activities on his November 27, 2002 physical examination, an MRI
and x-rays of both of Ferris' shoulders.  The fact that Dr. Miles
wrote May, 1999 as the date of the onset of the impairments is not
sufficient to discredit his opinion.  The ALJ could have asked for
clarification of Dr. Miles' statement regarding the date of onset.
Dr. Miles' credibility is otherwise unquestioned.

     C. Dr. Qian

     The ALJ also erred in finding that the limitations imposed by
Dr. Cistone and Dr. Qian were substantial evidence sufficient to
overcome treating physician and specialist Dr. Miles' more
restrictive opinion.  Ferris asserts that she only saw Dr. Qian for

United States District Court

For the Northern District of California

ten minutes, that he did not look at her hands, and that he did not
have enough time to conduct the examinations he claims he did in
that time period.  Ferris also contends that Dr. Qian misrepresents
himself as a specialist by calling himself "board eligible."  The
American Board of Physical Medicine and Rehabilitation does not
accept the use of such a term.[4]  Dr. Cistone was a non-examining
physician.  Dr. Qian and Dr. Cistone's opinions are insufficient to
support the ALJ's decision in the absence of specific, legitimate
reasons supported by substantial evidence in the record.

The ALJ also erred in relying on Dr. Geiger's (the Court
assumes the ALJ meant Dr. Robert Geiger) assessment of Ferris'
complaints of shoulder pain in 2000, considering that the alleged
onset of the severe shoulder problems was not until 2002.  AR at
19.  Moreover, the ALJ did not mention the partial thickness tear
of the rotator cuff in Ferris' right shoulder.  AR at 19.  In sum,
the ALJ should clarify Ferris' medical impairments.

III. Ferris's Credibility

In Cotton v. Bowen, 799 F.2d 1402 (9th Cir. 1986), the Ninth
Circuit developed a threshold test to determine the credibility of

---

[4]The American Board of Physical Medicine and Rehabilitation
(ABPMR) states:

"Board admissible" is a term used by the ABPMR to define the
status of an applicant who has been accepted by the ABPMR as a
candidate to take the examination for which he or she has
applied. Designation of "Board admissible" does not continue
beyond the date such an examination is given, regardless of
results. The Board does not accept any use of the term "Board
eligible" in lieu of documented admissibility.

ABPMR, ABPMR Certification Booklet of Information 2005-2006
Examinations (available at http://www.abpmr.org/downloads/
applications/docs/certification_booklet_2005.pdf).

21

United States District Court

For the Northern District of California

a claimant's subjective symptom testimony.  Under Cotton, a claimant "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (quoting Cotton, 799 F.2d at 1407-08); see also Smolen, 80 F.3d at 1282.  Cotton requires "only that the causal relationship be a reasonable inference, not a medically proven phenomenon."  Smolen, 80 F.3d at 1282.  Therefore, a claimant is not required to produce objective medical evidence of the pain itself or its severity.  Id. (citing Bunnell, 947 F.2d at 347-48).  "It is improper as a matter of law for an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings."  Cotton, 799 F.2d at 1407; Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).

Once a claimant meets the Cotton test, "the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupportable by objective evidence. Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be 'clear and convincing.'"  Lester, 81 F.3d at 834 (quoting Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)); Smolen, 80 F.3d at 1281.  The ALJ must do more than "make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p (citation omitted).

When deciding whether a plaintiff's testimony is incredible, the ALJ must consider "all of the available evidence" in analyzing

22

the severity of the claimed pain.  SSR 88-13.  Factors to be

analyzed include: (1) the nature, location, onset, duration,

frequency, radiation and intensity of any pain; (2) precipitating

and aggravating factors; (3) type, dosage, effectiveness and

adverse side effects of any pain medications; (4) treatment, other

than medication, for relief of pain; (5) functional restrictions;

and (6) the plaintiff's daily activities.  Id.; see Fair, 885 F.2d

at 603 (types of activities ALJ may rely on to find pain

allegations credible include the type of daily activities performed

by plaintiff and whether plaintiff sought or followed treatment);

Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001) (finding

rejection of plaintiff's alleged pain testimony justified where

plaintiff had little evidence of spinal abnormalities, had not used

strong pain medication, had not participated in pain management or

physical therapy and limited daily activities by choice not

necessity).  However, medical evidence is still relevant in

determining the severity of a plaintiff's alleged pain and its

disabling effects.  20 C.F.R. § 404.1529(c)(2); Rollins v.

Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  When pain is an

issue, the plaintiff's demeanor at a hearing before the ALJ is not

conclusive evidence of the plaintiff's credibility.  Gallant, 753

F.2d at 1455.

    To support his conclusion that Ferris could work, the ALJ

listed daily activities Ferris stated she was able to do and noted

that Ferris took strong medication that allowed her to control her

pain.  However, the ALJ did not mention that Ferris had stated on

the questionnaire that she was only able to do these activities

"very slowly," spreading them "out over the week."  Nor did he

mention that some days she did "nothing" or that she couldn't sleep

more than "1-2 hours at a time."  Nothing in the record contradicts

these statements.  The ALJ found Ferris had severe impairments,

which would support her testimony of severe pain.  Her limited

abilities might not allow her to work at a reasonable pace.  The

ALJ erred in finding Ferris not fully credible based on her

testimony about her ability to complete household tasks.

IV. The ALJ's Acceptance of the Vocational Expert's Testimony

    A hypothetical question posed to a vocational expert must set

out all of the claimant's limitations.  See Andrews v. Shalala, 53

F.3d 1035, 1044 (9th Cir. 1995).  "If the assumptions in the

hypothetical are not supported by the record, the opinion of the

vocational expert that claimant has a residual working capacity has

no evidentiary value."  Embrey v. Bowen, 849 F.2d 418, 422 (9th

Cir. 1988) (quoting Gallant v. Heckler, 753 F.2d 1450, 1456 (9th

Cir. 1984)); see also Desrosiers v. Secretary of Health and Human

Servs., 846 F.2d 573, 578 (9th Cir. 1988) (depiction of the

claimant's disability must be "accurate, detailed, and supported by

the medical record") (Pregerson, J. concurring).  Excluding a

claimant's subjective complaints in a hypothetical question posed

to a vocational expert is not improper if the ALJ makes specific

findings explaining his or her rationale for disbelieving any of

the claimant's subjective complaints not included in the

hypothetical.  See Light v. Social Sec. Admin., 119 F.3d 789, 793

(9th Cir. 1997); see also Copeland v. Bowen, 861 F.2d 536, 540 (9th

Cir. 1988).  An ALJ may rely on expert testimony which contradicts

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

the DOT, but only insofar as the record contains persuasive evidence to support the deviation.  Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995).

Raschke disagreed with the DOT description of the job of a medical records clerk as requiring frequent reaching.  Instead, Raschke testified that medical records clerks largely sit at their desks and do not handle anything heavier than a keyboard or pen, and that filing is a small part of their daily activities.  Thus, Raschke gave a specific reason for his disagreement with the DOT by suggesting that the filing referred to in the DOT description was not a significant, frequent part of the job, and that it was outdated due to developments in technology.

The ALJ stated that he found Raschke's testimony to be persuasive because the job of a medical records clerk required frequent gripping and grasping and light movement of the arms, all at desk-top level, rather than frequent extension of the arms and movement of the shoulders.  The ALJ mischaracterized Raschke's testimony when the ALJ said that "all" of the movements of a medical records clerk occurred at desk-top level.  In fact, Raschke's testimony that frequent reaching was restricted to a three-by-five desk area did not apply specifically to the medical records clerk job but rather to the general clerical occupations being discussed at the time he gave that testimony.

Ferris testified at the hearing that one of the problems she had in her job as a medical assistant was pulling charts "because some were overhead and some were low and it was just real strenuous on my shoulders."  Ferris has submitted evidence that typical

United States District Court
For the Northern District of California

1   medical files extend six or seven feet in height.  Thus it is

2   likely that, as a medical records clerk, Ferris would be required

3   to pull overhead files at least occasionally, which is beyond the

4   scope of her RFC.

5       Raschke's own testimony suggests that "pulling" files is done

6   "occasionally" by a medical records clerk.  Raschke did not address

7   the typical location of the files.  While he testified that

8   reaching was occasional rather than frequent, he did not address

9   the type of reaching and pulling required to file medical records.

10  The ALJ's RFC for Ferris prohibited any overhead pushing and

11  pulling, which would be required if the filing cabinets reached to

12  six or seven feet, as shown in Ferris's submitted evidence.  The

13  ALJ thus erred in finding that Raschke's testimony overrode the DOT

14  because the record does not contain persuasive evidence to support

15  the deviation.

16  IV.  Remand for Reconsideration

17      Ferris asks the Court to reverse and award benefits rather

18  than remand for further administrative proceedings.

19      The Court has discretion to remand the case for further

20  administrative proceedings or to award payment of benefits.

21  Swenson, 876 F.2d at 689.  An award of benefits is appropriate

22  where no useful purpose would be served by further administrative

23  proceedings or when the record has been fully developed and there

24  is insufficient evidence to support the ALJ's conclusion.

25  Rodriguez, 876 F.2d at 763.  Where remand would only delay the

26  receipt of benefits, judgment for the plaintiff is appropriate.

27  Id.  However, remand for further proceedings is appropriate where

28

United States District Court
For the Northern District of California

1   additional proceedings could remedy defects.   Id.

2       At step five of the sequential evaluation process, the ALJ

3   determined that Ferris could do the work of a medical records

4   clerk.  In doing so, the ALJ improperly relied on Raschke's

5   testimony that disagreed with the DOT.  The ALJ found Ferris not

6   fully credible for insufficient reasons.  He also improperly

7   discredited Dr. Miles' opinion, relied on Dr. Qian's opinion

8   without further investigation and did not address the impact of

9   Ferris' obesity on her other impairments.  Remand is proper under

10  these circumstances.  The ALJ must reconsider the evidence at step

11  five in light of this Court's opinion and determine if there are

12  jobs that Ferris could perform.

13      The Court reverses the ALJ's decision and remands Plaintiff's

14  claim for further proceedings consistent with the Court's findings.

15

16                          CONCLUSION

17      For the foregoing reasons, the Court DENIES Plaintiff's motion

18  for summary judgment, DENIES Defendant's motion for summary judgment

19  and REMANDS to the Commissioner for further proceedings.  Judgment

20  shall enter accordingly.

21      IT IS SO ORDERED.

22

23

24  Dated: 7/22/05

25                                  CLAUDIA WILKEN
                                    United States District Judge
26

27

28                              27